

**U.S. Department of Justice**

*United States Attorney's Office*
*District of Delaware*

---

*Nemours Building*  
*1007 Orange Street, Suite 7100*  
*P.O. Box 2046*  
*Wilmington, Delaware 19899-2046*

*(302) 573-6277*  
*FAX (302) 573-6220*

September 1, 2005

Honorable Sue L. Robinson
Chief Judge
United States District Court
J. Caleb Boggs Federal Building
844 King Street
Wilmington, Delaware   19801

>   Re:   **United States v. Tyrone Williams**
>         **Criminal Action No.   05-38-SLR**

Dear Chief Judge Robinson:

    The Court held a suppression hearing in this case on August 1, 2005. The Court asked for post-hearing briefing. The only issue is whether the Glock pistol that was seized from the Defendant should be suppressed.

### Background

    "[W]e have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile. 'According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (per curiam).

### The Facts

    On the morning of March 17, 2005, the Wilmington Police received an anonymous 911 call. T:4,24-25. The caller, who sounded sober and alert (GX-1), reported that two black males were sleeping in a particular car in front of 1019 Elm Street, gave the license number of the car, and reported that they had been there an hour and a half, and the caller did not recognize them or their car as being from the neighborhood. T:24-25. Corporal Ronald Muniz, a seven-year veteran of the Wilmington Police, was dispatched to investigate the complaint. T:3-4. After about ten to fifteen minutes, Corporal Muniz found the described car at the described location. T:6-7. There were two black males in it. T:8. It was about 40 degrees and sunny. T:8. Corporal Muniz drove by the two men in the car, and parked. T:8-9. The driver of the car was the Defendant, Tyrone Williams. T:10. The Defendant saw Corporal Muniz, the two men in the car then began looking at each other, and the Defendant began shifting around in his seat. T:8-9. As Corporal Muniz approached the car, he saw

---

the Defendant shifting his right side back toward the seat, and his left side forward, away from the seat. T:10. Corporal Muniz noticed that the Defendant's right hand was down by his right side, and that there was a bulge in the right side pocket of his Army jacket. T:11.

Corporal Muniz then asked the Defendant some questions. He asked him what he was doing in the area, to which the Defendant replied that he was going to help his boys move. T:11. He asked him where his boy was, and the Defendant pointed up the street. T:12. He asked him how long he had been there, to which the Defendant's response was forty-five minutes to an hour. T:12. Corporal Muniz was concerned about the driver's hands, and asked the driver to keep them where Corporal Muniz could see them. T:12. Corporal Muniz asked the Defendant whose car it was, to which the Defendant responded, one of his friend's boys. T:13. The Defendant could not identify the friend's boy's name. T:13. Corporal Muniz asked for identification, and the Defendant made a quick motion, in the vicinity of the bulge in the Army jacket. T:19. The Defendant produced identification in the name of Shamar Whitehead. T:13. The identification stated that he was born in 1972. T:18. Corporal Muniz thought the defendant looked "much older" than a person born in 1972. T:18. This made him doubt the genuineness of the identification. T:18.

Corporal Hazzard arrived as back-up. T:20. Corporal Muniz was concerned about whether the Defendant had a weapon due to the way he was shifting in his seat, and then asked whether he did have any weapons in the car or on his person. T:21. The Defendant's demeanor changed, becoming belligerent, cursing, and acting indignantly in response to the question about weapons. T:21. The change in demeanor caused Corporal Muniz concern. T:21. Corporal Muniz asked the driver to step out of the car so that he could perform a patdown search for weapons. T:21. The Defendant continued to curse, and to act suspiciously, by holding the right side of his body against the car, away from Corporal Muniz. T:21-22. The Defendant also resisted Corporal Muniz's instruction to spread his legs. T:22. Resisting the instruction to spread his legs made it more difficult for Corporal Muniz. T:22. When the Defendant dropped his right hand, Corporal Hazzard grabbed it. T:22. Corporal Hazzard patted down the Defendant on his right side, which is where Corporal Muniz indicated the pat-down was needed. T:22. When Corporal Hazzard patted down the Defendant's right side, he felt a weapon, said, "gun," and Corporal Muniz arrested the Defendant. T:22-23. The recovered gun was a Glock 23. T:23.

## The Law

A "police officer may perform a reasonable search for weapons – also known as a 'patdown search' – if the police officer has reason to believe, based on specific reasonable inferences, that the individual stopped is armed and dangerous." *United States v. Monroe*, 1997 WL 309497, *2 (D.Del. 1997) (Robinson, J.) (citing *Terry v. Ohio*, 392 U.S. 1, 26, 30 (1968)). In *Pennsylvania v. Mimms, supra*, the Supreme Court considered a pat-down search that had occurred after the driver of an automobile had been stopped and issued a ticket for driving with an expired license plate. The officer asked the driver to step out of the car.

Re: Tyrone Williams

---

He did so. The officer then "noticed a large bulge under [the driver's] sports jacket. Fearing that the bulge might be a weapon, the officer frisked [the driver] and discovered in his waistband" a gun. *Mimms*, 434 U.S. at 107. The Supreme Court held:

> There remains the second question of the propriety of the search once the bulge in the jacket was observed. We have as little doubt on this point as on the first [issue decided by the Court]; the answer is controlled by *Terry v. Ohio, supra*. In that case we thought the officer justified in conducting a limited search for weapons once he had reasonably concluded that the person whom he had legitimately stopped might be armed and presently dangerous. Under the standard enunciated in that case – whether "the facts available to the officer at the moment of seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate" – there is little question the officer was justified. The <u>bulge in the jacket</u> permitted the officer to conclude that [the driver] was armed and thus posed a serious and present danger to the safety of the officer. In these circumstances, any man of "reasonable caution" would likely have conducted the "pat down."

*Id.* at 334 (underlining added).

### Analysis

The Government respectfully submits that this case is controlled by *Pennsylvania v. Mimms*. Corporal Muniz responded to a 911 complaint, and conducted an investigation to determine the accuracy of the complaint. He therefore approached the Defendant, who was in a parked car on a public street, and started to investigate the complaint. Before any questioning, Corporal Muniz saw a bulge in the Defendant's jacket, and the Defendant's attempt to turn his right side away from Corporal Muniz. At this point, nothing had been done that implicated the fourth amendment. *See, e.g., United States v. Kim*, 25 F.3d 1426, 1430 n.1 (9th Cir. 1994) ("other circuits in factually similar cases have consistently held that an officer's approach of a car parked in a public place does not constitute an investigatory stop or higher echelon Fourth Amendment seizure"). Further, Corporal Muniz at this point had a reasonable suspicion that the Defendant had a gun, which not only raised safety concerns, but also a possible violation of Delaware law, namely, carrying a concealed deadly weapon. *See* 11 <u>Del. Code</u> §1442. Thus, before asking any questions of the Defendant, Corporal Muniz was already in a position comparable to that of the police officer in *Mimms*. The only justification for the pat-down search in *Mimms* was the bulge in the driver's jacket. It would therefore appear that on that basis alone the Court should deny the suppression motion.

There was, however, significantly more reason for Corporal Muniz to suspect that the Defendant had a weapon, by the time he asked the Defendant to get out of the car and did the pat-down, than there was for the officer in *Mimms*. First, Corporal Muniz knew, as soon as he drove upon the scene that most of what the

anonymous caller had said was true – that is, that there were two men who had been sitting in a car, for no obvious reason, for a period of time on a cold morning. Second, with a couple of questions,[1] Corporal Muniz verified the essence of the rest of the anonymous call – that is, that the two men were not from the neighborhood, and had been there a significant period of time, forty-five minutes to an hour by the Defendant's admission. Third, Corporal Muniz was obtaining information from the Defendant that only raised further suspicions. The Defendant gave a vague description of the supposed owner of the car, and could not identify him by name. The Defendant produced an identification card on which the date of birth did not appear to correspond to what Corporal Muniz was observing about the Defendant's age. Fourth, the Defendant's behavior, shifting in the seat, and keeping his right side, where the bulge in the jacket was, away from the officer, further raised Corporal Muniz's suspicions. Fifth, when asked whether he had any weapons, "he turned into a different person." T:23. All of these factors, when combined with the bulge in the jacket, more than justified Corporal Muniz in asking the Defendant out of the car and in conducting the pat-down search.

Conclusion

Wherefore, the United States respectfully requests that the Court deny the Defendant's motion to suppress the Glock pistol.

Respectfully submitted,

COLM F. CONNOLLY
United States Attorney

By: /s/ Richard G. Andrews
Richard G. Andrews
First Assistant United States Attorney

pc: Penny Marshall, Esquire
Clerk, U.S. District Court

---

[1] "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostwick*, 501 U.S. 429, 434 (1991).