IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No. 05-38-SLR |
| | : | |
| | : | |
| TYRONE WILLIAMS, | : | |
| | : | |
| Defendant. | : | |

**RESPONSE TO GOVERNMENT'S LETTER MEMORANDUM
IN OPPOSITION TO
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Penny Marshall, Esquire
Federal Public Defender
704 King Street, Suite 110
Wilmington, DE  19801
(302) 573-6010
Attorney for Defendant Tyrone Williams

Date: September 19, 2005

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.      Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        A.      The Anonymous Tip, Which Indicated Two Black Men Were Sleeping in a Car, Provided No Criminal Activity upon Which to Justify the Search or Seizure of Mr. Williams . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        B.      Mr. Williams Was Seized Within the Meaning of the Fourth Amendment . . . . . . 7

        C.      The Tip Provided No Information Supporting Particularized Suspicion . . . . . . . . 8

II.     Mr. Williams Was Not Stopped for Violating a Traffic Offense for Which He Could Be Arrested or Made to Get out of His Car, Such as in <u>Pennsylvania v. Mimms</u>, 434 U S. 106 (1977); Therefore, the Stop and Search Was Unauthorized . . . . . . . . . . . . . . . . . . . . . 11

III.    The Officer Did Not Reasonably Believe That Mr. Williams Was Armed Justifying Removal from the Vehicle and the Pat Down Search . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## TABLE OF AUTHORITIES

Adams v. Williams, 407 U.S. 143 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Alabama v. White, 496 U. S. 325, 333 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Beck v. Ohio, 379 U.S. 89, 91 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Brown v. Texas, 443 U. S. 47 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Delaware v. Prouse, 440 U.S. 648, 649 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Katz v. United States, 389 U.S. 347, 357 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Florida v. Bostick, 501 U.S. 429, 437 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Florida v. J.L. 529 U.S. 272 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Hayes v. Florida, 470 U.S. 811 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Illinois v. Gates, 462 U. S. 213, 245 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Johnson v. Campbell, 332 F.3d 199 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Michigan v. Chesternut, 468 U.S. 567, 569 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

State of New Jersey v. Kuhn, 517 A.2d 162, 165 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Terry v. Ohio, 392 U.S. 1 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Brignoni-Ponce, 422 U. S. 873 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Cortez, 449 U.S. 411, 417 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. Kithcart, 134 F.3d 529, 531 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Matlock, 415 U. S. 164, 177 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

 United States v. Nash, 2002 WL 31500920, at *3 (D. Del. Nov. 6, 2002) . . . . . . . . . . . . . . . . 8

United States v. Pelullo, 173 F.3d 131, 136 (3rd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Roberson, 90 F. 3d 75 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Shaefer, Michael & Clairton, 637 F.2d 200 (3rd  Cir. 1980) . . . . . . . . . . . . . . 17

United States v. Wood, 106 F.3d 942 (10th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

Wong Sun v. United States, 371 U.S. 471 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## STATEMENT OF FACTS

On March 17, 2005, an unknown person called 911 in Wilmington, Delaware, at 7:52 a.m., and reported that two black men were in a light gray Dodge Intrepid, tag number DE 772602, located at 1019 Elm Street. The caller further stated that he had been up for about an hour and a half, the men had been sleeping, and he had not previously seen the car in the neighborhood. No crime was alleged by the caller. (Government Exhibit 1, 2) Tr. 54.

Corporal Muniz of the Wilmington Police Department responded to the call, via police vehicle. He observed a gray Dodge Intrepid legally parked in front of 1019 Elm Street. Tr. 7. There were two black men sitting in the vehicle, neither of whom were observed sleeping. Tr. 9, 34. The seats appeared to be reclined; however, he was able to make eye contact with the driver. The men were not observed moving in and out of the car as if casing any residence or business. Tr. 54. The temperature on March 17th was chilly, about 40 degrees; thus, the gloves observed on the dashboard had no significance. Tr.34-5. No criminal activity was observed being committed by either individual. The 1000 block of Elm Street, in Wilmington, Delaware, is bordered by Porter, Jackson, Van Buren, Chestnut, Lyndon and Third streets. Tr. 33-4, 90. Despite Corporal Muniz' testimony that implied that the neighborhood consists of elderly white persons, the neighborhood is also occupied by Hispanics and African-Americans. Tr. 31. Further, there was no indication that this was a high crime area.

According to Government admitted Exhibit 3 (dispatch record of the Wilmington Police Department), the 911 call occurred at 7:52 a.m and Corporal Muniz spoke to the Dispatch at 7:54 a.m. Corporal Muniz arrived at 8:16:33 a.m., whereas Officer Matthew Hazzard arrived at 8:16:35 a.m. K-9

1

2 (a canine unit) and police unit 16E arrived at 8:17:05 a.m. and 8:23:28 a.m., respectively.  Tr. 56-7.[1]

Upon arrival, Corporal Muniz stopped his marked police cruiser and existed his vehicle.  He stated that he observed that the person in the driver's seat had his body "slightly turned" away from him, and that the driver's right arm was near the driver's right side.  Tr. 10.  The driver was speaking to the passenger, who was seated to his right.  Tr. 9.  The driver was wearing a three quarter length open green "Army Jacket" with sleeves and pockets. Tr. 11, 37.  The passenger was also appropriately dressed for the weather.  Corporal Muniz went to the window, knocked, and told the driver to open it.  The driver complied.  Tr. 74.  Corporal Muniz stated that he observed a bulge on the right side of the driver, but he then told both the driver and the passenger to put their hands "in their lap," which would have placed each of their hands closer to the bulge.  Tr. 46.  One or both men had their hands in the air, but were told to put them down in their laps. Corporal Muniz began to ask questions about what their "business abroad was."  Tr. 11.  The driver responded, indicating that he was helping one of his "boys" move.  He pointed to where the friend was located. Tr. 12.   When asked how long he had been there, the driver told the officer that he had been waiting about 45 minutes to an hour for his friend.  Tr. 82.

At the suppression hearing, the passenger, Herbert Hardison, related that he heard the conversation between Corporal Muniz and the driver, Tyrone Williams.  Mr. Hardison confirmed what their purpose was for being on Elm Street.  Mr. Hardison, a married father of six who was at the time laid off, had assisted the driver, Tyrone Williams, with hanging drywall the day before.   He agreed to

---

[1]Despite the clear record of events from the government dispatch record, Corporal Muniz claimed that he did not immediately have back up. Corporal Muniz disputed some of the timing listed on the government introduced dispatch records.  He contended that Officer Hazzard arrived approximately a minute or two minutes later than that provided on the report.

2

help Mr. Williams with moving his friend the following morning. Tr.73. Mr. Hardison remembered that their wait was interrupted when a police car came down a one-way street and parked at an angle. Other police cars came right behind him, by the time he got out. Tr. 80. An officer had appeared at his window with his hand on his gun which caused him to raise his hands. Tr. 74.[2]

Corporal Muniz claimed, at the hearing, that he was concerned about the bulge; however, he had continued to ask questions and required the driver to move around in the car to produce identification documents. Tr. 19. (See Defense Exhibit 12[3]). Corporal Muniz inquired about who the car belonged to, to which Mr. Williams responded that it belonged to a friend of his friend, whom he was helping to move. When Corporal Muniz asked for identification, the driver quickly complied by moving to retrieve his license.[4] Tr. 19. Corporal Muniz stated that he told Mr. Williams to remove it slowly. The license was taken from a wallet in the back pants pocket *on the side of* Mr. Williams' body where the officer claimed there was a bulge. Tr. 49. The wallet was taken out with the right hand and the license was removed from the wallet with the left hand and passed to the officer.[5] Tr. 86-7. For the first time, at the suppression hearing, Corporal Muniz said, as to the license, that "he looked

---

[2] Herbert Hardison remembered that at one point both men had their hands up. Tr. 75.

[3] Attachment 1 is a typed version of the handwritten exhibit reflecting a time line of Corporal Muniz' alleged observations.

[4] According to Corporal Muniz, he appeared nervous. Mr. Hardison, who was seated next to Mr. Williams, did not observe him appear especially nervous, nor did he see a bulge or a gun on Mr. Williams. Tr. 76.

[5] Corporal Muniz claimed that a single license was taken from a front right pants pocket near, where the bulge would be located. Tr. 52. It is more likely that the license was taken from a wallet as testified to by Mr. Hardison.

much older, than the person born in '72." [6]

Next, Corporal Muniz requested an insurance card and registration, and again, Mr. Williams complied. [7] Tr. 76. At the same time that Mr. Williams was being questioned, the officer located at the side of the car where Mr. Hardison was seated required that he too produce his license.

Nothing Mr. Williams told the officer was confirmed as being untrue, prior to his being required to get out of the car. Tr. 43. Although no crime had still been observed and he received no prior information about weapons, Corporal Muniz began asking Mr. Williams if he had a weapon. Mr. Williams reacted to being questioned about gun possession. Corporal Muniz testified that Mr. Williams became different when asked about weapons, becoming belligerent. Both Williams and Hardison were then required to get out of the car for a pat-down search.

Mr. Williams was forced to put his hands on the car and spread his legs. However, because Mr. Williams' legs were not spread enough, and his left hand was, at one point, dropped, and he turned his right side slightly toward the vehicle, Mr. Williams was told to keep his hands where Corporal Muniz could see them. According to Corporal Muniz, he wanted to keep the legs "as open as possible" because "it prevents them from taking any action against me or running away." Officer Hazzard did the pat-down, reached into the pocket, and pulled out a gun. When the gun was pulled out, Corporal Muniz tripped Mr. Williams' leg, took him down, handcuffed him, and put his knee on his neck. At the same time, Corporal Muniz said that he pointed his gun at Mr. Hardison. Officer Hazzard did not

---

[6] He was unable to identify the date that the license was issued. The license, which was in the name of Shamar Whitehead, was not provided to the defense, nor was it admitted at the hearing. Tr. 14-16.

[7] Although Corporal Muniz claimed not to remember if he got the insurance card and registration, he admitted it would have been police practice. Tr. 41.

tell Corporal Muniz that the bulge was a gun until after he pulled it out. Tr. 67.

Mr. Williams was taken down to the police station were he gave a statement consistent with this motion.

> I was sitting in the car minding my business. I didn't look suspicious, because this is what I got on. What is suspicious about this and an army coat. What is suspicious about two men sitting in a car on the corner. We wasn't drinking, we wasn't smoking, we wasn't loud talking, we was conversating. Waiting for somebody to come so we could help them move their stuff. Where is the suspicion in that? ... We are in the car minding our own business, were not doing anything. What suspicious is that? Were not walking up and down the street, were not standing on the corner.

Attachment 2.[8]

Mr. Hardison was also arrested, having been searched, handcuffed and put into a police car. At the station, he was handcuffed to a chair and interrogated by two different officers. He spoke with police about the incident in a taped statement. He was held for several hours, despite having not committed any crime, but was eventually released.

---

[8] Attachment 2 is a courtesy copy of a transcript of Exhibit 12 admitted at the suppression hearing .

## ARGUMENT

### I.     BACKGROUND

The government resorts to hyperbolic sensation to justify what is an illegal search. In doing so, the government submits the following quote: "According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile." Government Letter Memorandum (Gvt. Ltr. mem.) at 1 (quoting Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977) (per curiam)) (internal quotations omitted). The vast majority of car stops do not, however, result in violence. While it is an unfortunate circumstance that anyone, including a police officer, is injured by a weapon, the Supreme Court has not authorized a gun exception to the Fourth Amendment.

In Florida v. J.L., the Supreme Court specifically declined to establish a firearms exception to the Fourth Amendment:

> ...an automatic firearm exception to our established reliability analysis would rove too far. Such an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun. Nor could one securely confine such an exception to allegations involving firearms.

529 U.S. 266, 272 (2000).

### A.     The Anonymous Tip, Which Indicated Two Black Men Were Sleeping in a Car, Provided No Criminal Activity upon Which to Justify the Search or Seizure of Mr. Williams.

The Court's analysis begins with the Fourth Amendment's guarantee that no "person" shall be subject to an unwarranted search or seizure. It is well-settled "that a search *(or seizure)* conducted without a warrant issued upon probable cause is *per se* unreasonable subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)

6

(quoting <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967)).  It is the government who has the burden of proving the validity of a warrantless search.  <u>United States v. Matlock</u>, 415 U. S. 164, 177 (1974).

The government relies on <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), to justify the warrantless search. <u>Terry</u> authorizes a brief investigatory stop when an officer has reasonable a articulable suspicion to believe that criminal activity is afoot.  The Court pointedly rejected the notion that mere "suspicion" could support a stop and or a frisk.  <u>Id.</u> at 21, 22.  An officer must "be able to point to specific and articulable facts which ... reasonably warrant [the] intrusion" effected by a stop and frisk. <u>Id.</u> at 21.  "Anything less [than particularized suspicion] would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulable hunches, a result [the Supreme Court] has consistently refused to sanction."  <u>Id.</u> at 22.

**B**.      **Mr. Williams Was Seized Within the Meaning of the Fourth Amendment**.

A stop or seizure is defined as circumstances which would advise a man of a reasonable belief that he was not free to leave.   "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."  <u>Id.</u> at 16.  In other words, considering all of the circumstances surrounding the encounter, the issue is whether the police conduct would "communicat[e] to a reasonable person that he was not at liberty to ignore the police presence and go about his business."  <u>Florida v. Bostick</u>, 501 U.S. 429, 437 (1991) (quoting from <u>Michigan v. Chesternut</u>, 468 U.S. 567, 569 (1988)).

Mr. Williams was legally parked when several officers from the Wilmington Police department came in marked police cruisers to his location.  The dispatch records show that two cars arrived within a couple seconds of each other and another canine unit arrived shortly thereafter.  Corporal Muniz and his police car prohibited Mr. Williams from driving away.  Another officer appeared at the

7

window where Mr. Hardison was seated, with his hand on his weapon. Corporal Muniz knocked

on the window and ordered that the window be rolled down. Mr. Williams was not told he was free

to leave; rather, he was required to produce identification documents, documents relating to the

ownership of the car, and ultimately, he was questioned about a weapon. Any reasonable person

would not feel free to leave.

### C.    The Tip Provided No Information Supporting Particularized Suspicion.

The reasonableness of official suspicion must be measured by what the officers knew prior

to a stop or a search. The United States Supreme Court has made it clear that for an anonymous tip

to be the basis for a finding of reasonable suspicion, there needs to be an adequate indicia of

reliability. See J.L., 529 U.S. 266; Adams v. Williams, 407 U.S. 143 (1972). "Although not arising

to the level of probable cause, reasonable suspicion requires that there be at least a minimal level of

objective justification for making the stop." United States v. Nash, 2002 WL 31500920, at *3 (D.

Del. Nov. 6, 2002).

As a threshold matter, inherent in evaluating the validity of a tip, is the notion that a crime is

being reported by the informer. Here, the government's brief relies on a tip provided by an unknown

individual whom there was no reason to believe had provided information upon which officers should

act.[9] The police went to 1019 Elm Street with no information that a crime was occurring. The only

---

[9] It had been recognized that anonymous tips seldom establish the tipsters basis of knowledge or veracity. The concern is that without affirmative reasons to believe that an informant is truthful and has a dependable source of information, the probability that an innocent person may be targeted is high. The character and motivations of an anonymous source are by definition unknown. He may be a liar, mentally unstable, irrational, fearful, or prone to leap to unsubstantiated conclusions. He may be prone to act based on a grudge, involved in a prank, or may be biased by racism. See e.g. Alabama v. White, 496 U. S. 325, 333 (1990) (Steven, J., dissenting.)

information pointed to was black males being in a car, that the caller did not recognize their car, and that they appeared to be sleeping. The government notes that the 911 caller appeared sober and alert; this supposition aside, nothing in his information suggested a reliable basis upon which to act.

Reasonable suspicion, like probable cause, is dependent upon both the content of the information possessed by police and its degree of reliability. Thus, both quantity and quality factors are considered in assessing the viability of an informant's tip. See White, 486 U.S. at 329; United States v. Cortez, 449 U.S. 411, 417 (1981). A bare-bones tip with minimal corroboration falls short of establishing reasonable suspicion and does not promote any constitutionally protected governmental interest. In Alabama v. White, supra, which was considered a close case, the tip was considered adequate because it predicted, among other things, future events and named the expected criminal activity. The tipster provided that: (1) the defendant would be leaving a particular apartment; (2) at a particular time; (3) in a brown Plymouth station wagon with the right  taillight lens broken; (4) the defendant could be going to a specified motel; and (5) that she would be in possession of about an ounce of cocaine inside a brown attaché. The Court noted that "easily obtained facts and conditions existing at the time of the tip" such as that there was a "car precisely matching the caller's description in front of the building," are not persuasive since anyone could have "predicted" that fact because it was a condition presumably existing at the time of the call. White, 496 U. S. at 332 (quoting Illinois v. Gates, 462 U. S. 213, 245 (1983). "What was important was the caller's ability to predict respondent's *future behavior,* because it demonstrated inside information – a special familiarity with respondent's affairs." Id. (emphasis added); see also J.L., 529 U.S. 266 (evidence suppressed where anonymous caller provided the readily observable information that a young black man standing at a bus stop was wearing a plaid shirt and that this person possessed a concealed gun.);

9

United States v. Roberson, 90 F. 3d 75 (3d Cir. 1996) (evidence suppressed where anonymous tipster described the clothing, sex and race of a defendant purportedly selling drugs; however, there was no independent police corroboration of the illegal activity.)

In this case, the 911 caller's supposition that the men were not from the neighborhood, provided no predictive information as to criminal behavior. The caller identified the men as black men and he said that he had not seen the car in the neighborhood. There was no indication that the caller could see the faces of persons in the car to know whether they actually lived in the neighborhood or were visiting someone nearby on Elm Street or the surrounding area.

Corporal Muniz appeared to imply that the neighborhood was comprised of elderly white people. Not only was this factually incorrect but any implication that the race of the neighborhood should be considered is constitutionally forbidden. United States v. Brignoni-Ponce, 422 U. S. 873 (1975). As stated in State of New Jersey v. Kuhn, "no rational inference may be drawn from the race of one to be detained that he may be engaged in criminal activities." 517 A.2d 162, 165 (1986).

Verification that the men did not live in the neighborhood was irrelevant since it was not tied to criminal activity. As stated, the men could have easily been waiting for someone who lived on Elm Street or parked while waiting for someone who was in vicinity , as they had explained. In Brown v. Texas, 443 U. S. 47 (1979), an officer stopped an individual because he looked suspicious because he walked away from another person in a high crime area and *had not been seen in the area before*. The defendant refused to identify himself and angrily protested the stop. The Court held that this stop was invalid under the Fourth Amendment.

The tip in this case did not indicate any information that a crime was about to occur or that

10

there was behavior consistent with a criminal activity.  Noting that "Corporal Muniz found the described car at the described location, (Gvt. Ltr. mem. at 1), the government appears to urge that some of the facts of the tip were corroborated.  Since the tipster provided only the readily observable facts that two black men were seated in a car (not sleeping as described), this observation is of little relevance.  An accurate description of a subject's location and description only serves to identify the person that the informant is accusing.  However, tips with such limited information do not show that the tipster "has knowledge of concealed criminal activity." J. L., 529 U. S. at 272.

**II.     Mr. Williams Was Not Stopped for Violating a Traffic Offense for Which He Could Be Arrested or Made to Get out of His Car, Such as in Pennsylvania v. Mimms, 434 U S. 106 (1977); Therefore, the Stop and Search Was Unauthorized.**

At the time Mr. Williams was required to get out of his car, there was clearly no probable cause to believe that any traffic offense or other crime had been committed.   Police have probable cause to arrest when, at the moment of the arrest, "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964); United States v. Kithcart, 134 F.3d 529, 531 (3d Cir. 1997).

In Pennsylvania v. Mimms, which the government contends supports this search, the Court permitted a search under a Terry rationale to protect  officer's safety.  434 U.S. 106.  Before such as stop can occur, there must be a legal stop and reasonable suspicion that a person is armed. Officers may not  act on inchoate suspicion, inarticulate hunches or subjective good faith.

The Terry Court was aware of harassment and humiliation of certain groups; accordingly, it did not treat Terry stops lightly.  392 U.S. at 14.  The Court noted that:

[I]t is simply fantastic to urge that such a procedure [a Terry frisk] performed in public by a policemen while a citizen stands helplessly, perhaps facing a wall with

11

hands raised, is a "petty indignity." It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and is not to be undertaken lightly.

Id. at 16-7.

In <u>Mimms</u>, police officers were on patrol when they observed the defendant driving with expired tags, a violation under the Pennsylvania Motor Vehicle Code.  434 U.S. at 107.  The Court specifically observed that their focus was on "the *incremental* intrusion resulting from the request to get out of the car *once the vehicle was lawfully stopped***.**"  <u>Id</u>. at 109 (emphasis added).  And, reiterating the limited extent of its holding, the Court stated that "[w]e hold only that once a motor vehicle has been *lawfully detained for a traffic violation*, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."  <u>Id.</u> at 111 (emphasis added).

Unless there exists  "articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law," the Supreme Court has held that it is unreasonable under the Fourth Amendment for police to stop a vehicle just to check a driver's license and registration.  <u>Delaware v. Prouse,</u> 440 U.S. 648, 649 (1979) ("An individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation").

12

**III.    The Officer Did Not Reasonably Believe That Mr. Williams Was Armed Justifying Removal from the Vehicle and the Pat Down Search**.

The government urges that Corporal Muniz had reason to suspect that Mr. Williams was armed for a number of reasons. These will be addressed in turn. "First, Corporal Muniz knew, as soon as he drove upon the scene that most of what the anonymous caller had said was true — that is, that there were *two men*, who had been sitting in a car for *no obvious reason*, for a period of time on a *cold morning*." (Gvt. ltr. mem. p.3) (emphasis added). Nothing in this tip indicated that the men were armed and the fact that two men were sitting in a car does not arise to reasonable suspicion.[10] (See part I and II infra.). In Johnson v. Campbell, 332 F.3d 199 (3d Cir. 2003), African-American basketball coach Steven Johnson, had been in a motel office where an ex-police officer motel clerk called to report him as a suspicious person. Campbell arrived to observe Johnson located outside, sitting in a van with a passenger reading the paper. In this civil case brought against Officer Campbell, it was urged that the stop was proper because Johnson was reported by the motel witness to be nervous and agitated, that he paced, lacked purpose for being in the witness' office and gave "clipped answers to questions." Id. at 209. Campbell also insisted that the stop was valid because "two men sitting in a motel parking lot for no apparent reason on a cold night in December is inherently suspicious, and that Johnson's initial hostile response to roll down his window added to his suspicion." Id. The Third Circuit found that there was no reasonable suspicion and thus no justification for the stop. Id. at 215.

Second, the government asserts that Muniz confirmed that the two men were not from the

---

[10] The government's logic would lead one to believe that reasonable suspicion might be less if a converse factually scenario would have been present. Does the government urge that if the men had been outside the car, if it had been hot, if it had been night time or if it had been one man or two women, it was less likely that reasonable suspicion existed?

neighborhood and had been there for 45 minutes.  Although he should not been required to explain, Mr. Williams identified his "business abroad," as waiting for a friend to help him move.  Moreover, confirming how long Mr. Williams and his passenger had been there does not show that they were armed.  There was no indication of 'casing a job', or conducting a 'stick up,' as observed in <u>Terry v. Ohio.</u>

Next, the government claims that the information obtained from Mr. Williams was suspicious. The evidence is to the contrary.[11]  Mr. Williams indicated that the owner of the car was a friend of his friend that was having him help him move. There was no indication that the car was stolen; indeed the officer, consistent with his practice, received an insurance card and registration, which indicated who the car belonged to.  (Mr. Williams was never charged with not having either of those documents).  Then, as to the newly presented information that Williams did not look as if he was born in 1972, it is not clear whether the officer was referring to the picture on the license or the individual before him. In any event, this very subjective opinion surely cannot be the basis for reasonable suspicion.[12]

Fourth, the officer complained that Mr. Williams had his left arm forward so that he would have been slightly turned facing right.  Given that there was a person seated to his right, that is not suspicious.  He said that his right arm was near his right side; certainly his left arm was near his left

---

[11] The government does not suggest that nervousness is a reason for the stop, since it is "not uncommon for most citizens- whether innocent or guilty, to exhibit signs of nervousness when confronted by law enforcement officials." <u>United States v. Wood,</u> 106 F.3d 942 (10th Cir. 1997).

[12] This ground is highly suspect and it is urged that it be given no weight. The officer discussed the license for the first time at the motions hearing. He did not place it in his police report and did not save the license so his opinion could be challenged in court.

side. He claimed that Mr. Williams shifted, however he had him move or "shift" around further in the vehicle. Mr. Williams was required to roll down the window and obtain items from the glove compartment and his person.

Fifth, the fact that Mr. Williams responded when asked about weapons is understandable. As he expressed in his post arrest interview, there was no reason for his being accosted by police. He had not been observed doing anything wrong. For him to be asked about weapons was unjustified.

Finally, the claim that there was a bulge observed, both legally and factually, did not support a need to force Mr. Williams out of the vehicle for a search. Either no bulge was actually observed or it did not cause the officer to feel that he was in danger. A review of Corporal Muniz' testimony concerning the bulge supports this contention. (See Addendum 1)

The behavior of the officer refutes that he observed a bulge. The police report and the testimony of Corporal Muniz clearly show that he required the hands of the persons in the car to be placed in a position near the right side pocket of Mr. Williams. (Defendant's Exhibit 1). It would be incredible to believe, that having seen a bulge on Mr. Williams' right side, Corporal Muniz would require Mr. Williams to put his hands in his lap, near the bulge. It is likewise incredible for Muniz to have required passenger Mr. Hardison put his hands in his lap, closer to Mr. Williams' right side. And finally, permitting Mr. Williams to get his wallet from a pocket, right beside the bulge, further raises doubts about Muniz' suspicions at the time of the stop. When asked about this curious fact, Corporal Muniz quipped "He's got one, two pockets. It could have been in the dashboard." Tr. 50.

As stated, the bulge also did not give rise to reasonable suspicion since the officer did not believe it to be a weapon. At the motions hearing, at no time did Corporal Muniz say he recognized the bulge as being consistent with a weapon prior to the search. The government provided no

testimony as to the size shape or character of the alleged bulge.  Since the  response of seeing a bulge was to have the both the passenger and the driver to place their hands near it, it is highly unlikely that the officer believed it was a weapon.

## **CONCLUSION**

This case presents a fleshless tip, which does not provide predictive information, much less evidence of a crime. The report of two black men in a car, a car alleged to have been not recognized by an unknown person did not give rise to reasonable suspicion. Furthermore, this case is not similar to that presented in Pennsylvania v. Mimms, where a search occurred *after* a legitimate traffic stop.

In addition, the testimony of Corporal Muniz did not provide justification for Mr. Williams to be seized.  His claim that he observed a bulge is either not to be believed or it is clear that any observations he made did not cause him to believe that  Mr. Williams was armed.  None of the other events cited by the government, in total, or singularly, permitted Mr. Williams to be taken out of his car and searched.

The United States Supreme Court held in Wong Sun v. United States, 371 U.S. 471 (1963), that where evidence is seized illegally, suppression is required. See also Hayes v. Florida, 470 U.S. 811 (1985); United States v. Shaefer, Michael & Clairton, 637 F.2d 200 (3rd  Cir. 1980).  Evidence "derived from constitutional violations may not be used at trial because illegally derived evidence is considered 'fruit of the poisonous tree.'"  United States v. Pelullo, 173 F.3d 131, 136 (3rd Cir. 1999) (citing Wong Sun, 371 U.S. at 487-88).

**WHEREFORE**,  for these reasons and any other reasons that shall appear to the Court, the defendant requests the granting of this motion to suppress as specified, after a full hearing of this matter.

Respectfully submitted,

/s/
Penny Marshall, Esquire
Federal Public Defender
704 King Street, Suite 110
Wilmington, DE  19801
(302) 573-6010
Attorney for Defendant Tyrone Williams

18

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,         :
                                  :
              Plaintiff,           :
                                  :
V.                                :         Criminal Action No. 05-38-SLR
                                  :
                                  :
TYRONE WILLIAMS,                  :
                                  :
              Defendant.          :

## CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that a copy of the above Brief in Support of Defendant's

Motion to Suppress was filed electronically and is available for public viewing and downloading  and

was electronically delivered on September 19, 2005, to:


Richard G. Andrews, Esquire
First Assistant U.S. Attorney
Nemours Building
1007 Orange Street, Suite 700
Wilmington, DE  19801


/s/
Penny Marshall, Esquire
Federal Public Defender
704 King Street, Suite 110
Wilmington, DE  19801
(302) 573-6010
Attorney for Defendant Tyrone Williams

19