IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>TYRONE WILLIAMS,<br>Defendant. | ) | Crim. No. 05-038-SLR |

**MEMORANDUM OPINION**

---

Colm F. Connolly, United States Attorney and Richard G. Andrews, First Assistant United States Attorney. United States Attorney's Office, District of Delaware, Wilmington, Delaware. Counsel for Plaintiff.

Penny Marshall, Federal Public Defender. Federal Public Defender's Office, District of Delaware, Wilmington, Delaware. Counsel for Defendant.

---

Dated: December 1, 2005
Wilmington, Delaware

ROBINSON, Chief Judge

## I. INTRODUCTION

Defendant Tyrone Williams moves to suppress evidence seized on March 17, 2005.[1] (D.I. 10) An evidentiary hearing was held on August 1, 2005. (D.I. 14) Post-hearing briefing is complete. (D.I. 17, 18, 21) The court has jurisdiction pursuant to 18 U.S.C. § 3231. Pursuant to Federal Rule of Criminal Procedure 12(e), the following constitutes the court's essential findings of fact.

## II. FINDINGS OF FACTS

1. On March 17, 2005, at approximately 8:00 a.m., Wilmington Police received a "911" call.[2] (PX1, DX2) The caller stated that two black males were asleep in a grey car ("Intrepid") parked on 1019 Elm Street, Wilmington, Delaware.[3] The caller provided the Intrepid's Delaware license plate number and said the Intrepid had been parked there for over an hour. The caller did not recognize the car as being from the neighborhood and requested that police investigate.

---

[1]On April 25, 2005, a grand jury returned an indictment charging defendant with possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (D.I. 1)

[2]The tape recording of the call was admitted into evidence. (PX1, DX2)

[3]There was testimony that elderly Caucasians reside in this area. (Id. at 31) Federal Public Defender Investigator Sean Williams testified, however, that he has seen African Americans in this same area. (Id. at 31-34, 88, 91)

2. Wilmington Police radio log records reflect that patrol units were dispatched to 1019 Elm Street to investigate a "suspicious vehicle" with "two black males sleeping inside a grey Intrepid." (PX 2; PX3; D.I. 14 at 6, 25)

3. Officer Ronald Muniz ("Muniz")[4] arrived first on the scene at approximately 8:16 a.m.[5] (PX3; D.I. 14 at 7) Muniz drove his marked police vehicle past the Intrepid. (Id. at 8) Muniz parked his vehicle in front of the Intrepid. Muniz observed two black males reclined in the front seats of the Intrepid. The men were engaged in conversation. (Id. at 9, 37)

4. **Muniz's testimony.**[6] Muniz exited his vehicle, approached the Intrepid and knocked on the driver's side window. (Id. at 9, 36, 74) According to Muniz, he observed that

---

[4]Wilmington Police Corporal Muniz has been a member of the Wilmington Police Department for seven years. (Id. at 3) He received training in the characteristics of persons carrying weapons. (Id. at 28-29)

[5]The radio log reflects that officer Matthew Hazzard ("Hazzard") arrived at the scene less than a minute after Muniz arrived. A third officer, Richard Sutton, arrived within a few minutes of Hazzard. (PX3)

[6]Because of conflicts between the testimony of Muniz and Herbert Hardison, as well as the absence of objective support, the court cannot conclusively determine what occurred after Muniz approached the Intrepid. For this reason, the court makes no factual findings as to events that transpired after Muniz approached the vehicle to the point where the occupants were ordered out of the Intrepid.

defendant[7] was shifting back and forth in his seat and that defendant's right hand was positioned alongside his right leg. (Id. at 9, 10; 37) Defendant was wearing a green Army jacket.[8] Muniz testified that he noticed an unidentifiable bulge on the right side pocket of defendant's jacket. (Id. at 11, 49, 53)

5. Muniz asked the occupants what they were doing in the area. (Id. at 11) Defendant stated that they had been waiting there for about 45 minutes to meet a friend to help him move. (Id. 11-12, 47; DX2) Defendant explained that the friend lived in the area of Elm and Van Buren.[9] (Id. at 12)

6. Because Muniz was concerned about the bulge in defendant's jacket, he instructed defendant and Hardison to place their hands in their laps where Muniz could see them. (Id. at 13, 46, 51; DX1) Muniz asked defendant for identification. When defendant moved to retrieve identification from his front pant pocket, Muniz told him to move slowly. (Id. at 19, 48) Defendant retrieved the identification card from the area near the bulge. Muniz testified that defendant's hands were shaking as he handed Muniz an identification card bearing the name of

---

[7]Muniz identified defendant as the driver. (Id. at 10) Herbert Hardison was the passenger. (Id. at 71)

[8]It was about 40 degrees and sunny that morning. (Id. at 37)

[9]This is in the vicinity of where the Intrepid was parked. (DX4)

Shamar Whitehead.[10] (Id. at 17-18, 50, 52) Muniz stated that defendant's reaction in handing over the identification card caused him enough concern to radio a request for back-up assistance. (Id. at 19) Muniz thought that the date on the identification card looked much older than defendant appeared. (Id. at 18) Muniz asked defendant who owned the Intrepid, to which defendant replied that it belonged to "one of his boy's friend's."[11] (Id. at 50)

7. Contemporaneous to his conversation with defendant, Muniz observed that Officer Hazzard had arrived on the scene. (Id. at 20, 56) Hazzard parked his vehicle behind the Intrepid and positioned himself alongside the passenger window. (Id. at 20)

8. Muniz testified that he observed defendant shifting back and forth in his seat again. (Id. at 21) Because he had a back-up officer at the scene, Muniz asked defendant if he had any weapons. (Id. at 21, 64) Muniz averred that defendant's

---

[10]The identification card was not produced for the court's consideration. (Id. at 41) In fact, plaintiff's attorney did not know whether the card was a driver's license or an identification card or whether it belonged to an actual person. (Id. at 16-17) It is unclear whether the police are in possession of the card. Also notably absent was the testimony of Officer Hazzard.

[11]LaTear Warner testified that she owned the Intrepid. (Id. at 95, 97).

demeanor changed; he became agitated and uttered profanities. (Id. at 21-23) Muniz asked defendant to exit the Intrepid.

9. According to Muniz, defendant exited the Intrepid holding his right side against the vehicle. (Id. at 21) Muniz instructed defendant to put his hands on the Intrepid and to spread his legs. (Id. at 22) Officer Hazzard joined Muniz on the driver's side of the Intrepid. Hazzard conducted a pat down of defendant and discovered a weapon in defendant's pocket.[12] (Id. at 23, 67)

10. **Hardison's testimony.** Defendant called Herbert Hardison as a witness.[13] Hardison testified that he has known defendant for over 20 years. (Id. at 72, 79) Hardison explained that on March 16, 2005, he and defendant spent the day placing drywall in defendant's home. (Id.) During this time, Hardison agreed to assist defendant in moving a friend the following morning. (Id. at 73)

11. On the morning of March 17, 2005, defendant parked the Intrepid on 1019 Elm Street. (Id.) Hardison testified that they were awake and talking in the Intrepid as they awaited the

---

[12]A Glock 23 was recovered.

[13]Also testifying for defendant were: (1) Wilmington Police Detective John Ciritella, who authenticated a video tape containing statements made by defendant regarding the stop in issue; (2) Federal Public Defender Investigator Sean Williams, who testified about the neighborhoods, streets and racial make-up of the area near 1019 Elm Street; and (3) LaTear Williams, who testified that she owned the Intrepid.

arrival of defendant's friend. (Id.) After about twenty minutes, Muniz appeared at the driver's side window.[14] (Id. at 74, 82) In response, Hardison and defendant raised their hands. (Id. at 75) Hardison stated that Muniz told them to put their hands in their laps. (Id.)

12. Hardison testified that defendant removed the identification card from his back pocket and the insurance card/owner's information from the glove compartment. (Id. at 76) Hardison did not observe defendant acting nervous, shaking or shifting back and forth. (Id.) Defendant did not become agitated when Muniz asked about weapons. (Id. at 76-77, 87) Hardison stated that he did not see a bulge in defendant's jacket nor was he aware that defendant was carrying a weapon. (Id. at 76)

13. Hardison testified that, at about the time that he was providing his license to the officer standing next to the passenger window, defendant was asked to exit the vehicle. (Id. at 77) Hardison was then asked to exit the Intrepid and was present when defendant was searched. (Id.)

**III. STANDARD OF REVIEW**

1. Once a defendant has challenged the legality of a warrantless search and seizure, the burden is on the government

---

[14]Shortly thereafter, Hardison observed additional police cars arrive. (Id. at 74, 80) An officer with his hand on his gun positioned himself next to Hardison's window. (Id. at 74)

to demonstrate that the acts were constitutional. United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995). The applicable burden of proof for a suppression motion is a preponderance of evidence. United States v. Matlock, 415 U.S. 164, 178 n. 14 (1974).

2. The court is charged with reviewing the "credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence." United States v. McKneely, 6 F.3d 1447, 1453 (10th Cir. 1993); Government of the Virgin Islands v. Gereau, 502 F.2d 914, 921 (3d Cir.1974).

**IV. DISCUSSION**

**A. Terry Stop**

1. The Fourth Amendment of the United States Constitution protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. Except for limited circumstances, warrantless searches and seizures are per se unreasonable under the Fourth Amendment. United States v. Ross, 456 U.S. 798, 824-25 (1982). Evidence obtained during the course of an unreasonable search and seizure can be suppressed and not admitted at trial. Wong Sun v. United States, 371 U.S. 471 (1963); United States v. Pelullo, 173 F.3d 131, 136 (3d Cir. 1999).

2. The United States Supreme Court has held that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has reasonable, articulable suspicion that criminal activity is afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968); Illinois v. Wardlow, 528 U.S. 119, 123 (2000). These "stops" are "seizures" subject to protection under the Fourth Amendment. Johnson v. Campbell, 332 F.3d 199, 205 (3d Cir. 2003). Further, the officer may conduct a protective frisk of the suspect's outer clothing when he "observes unusual conduct that leads him to reasonably conclude in light of his experience that criminal conduct is afoot and that the persons with whom he is dealing may be armed and presently dangerous." Terry, 392 U.S. at 30.

3. In assessing whether an officer had reasonable suspicion for the stop and frisk, "due weight must be given not to his inchoate and unparticularized suspicion, or hunch, but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Id. at 27; United States v. Arvizu, 534 U.S. 266, 273 (2002)(police may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."); see also, Illinois v. Wardlow, 528 U.S. at 125 ("the determination of

reasonable suspicion must be based on commonsense judgments and inferences about human behavior").

4. Although reasonable suspicion is less demanding than probable cause, an officer must have some level of objective justification for that stop. United States v. Sokolow, 490 U.S. 1, 7 (1989). In evaluating the reasons for the stop and frisk, courts examine the totality of the circumstances. United States v. Valentine, 232 F.3d 350, 353 (3d Cir. 2000). An officer's skill and experience are indispensable to an evaluation of reasonable suspicion. United States v. Robertson, 305 F.3d 164, 168 (3d Cir. 2002).

5. Plaintiff submits that the search was proper because an officer may perform a reasonable pat-down search for weapons if the officer has reason to believe, based on specific reasonable inferences, that the person stopped is armed and dangerous. (D.I. 17) Plaintiff asserts that the facts at bar are controlled by Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977).[15]

---

[15]In Mimms, the police officer had legally stopped a vehicle for a traffic offense. It was the "officer's practice to order drivers out of their vehicles as a matter of course whenever they had been stopped for a traffic violation." 434 U.S. at 109-110. Once the Mimms driver was out of his vehicle, the officer noticed a bulge in his clothing that caused him to fear for his safety. The officer immediately conducted a pat-down search and discovered a gun. The Supreme Court concluded that the search did not violate the Fourth Amendment because safety considerations justified the officer in conducting a limited search for weapons after "he had reasonably concluded that the person whom he had legitimately stopped might be armed and presently dangerous." Id. at 111-112.

In Mimms, the United States Supreme Court extended its holding in Terry v. Ohio, 392 U.S. 1, to the context of a lawful traffic stop. Plaintiff further argues that Muniz had reasonable suspicion that defendant was carrying a concealed weapon which raised safety concerns as well as a possible violation of Delaware law under 11 Del. C. § 1442.

6. Although defendant challenges the search as illegal on several grounds, the crux of his argument is that the initial stop was unreasonable and that Muniz's observations about the bulge were a pretext to search defendant. (D.I. 18) Without a lawful reason to stop the Intrepid, defendant assets the Mimms case has no application to the facts at bar. Further, he argues that there are inconsistencies in the record that demonstrate Muniz did not have a reasonable belief that defendant was armed to justify the pat down search.

**B. Analysis**

1. "It is well-established that police officers who lack reasonable suspicion may approach and question people seated in vehicles in public places," because "merely approaching an individual, whether standing or in an automobile, does not constitute a seizure under the Fourth Amendment." United States v. Williams, 413 F.3d 347, 353-54 (3d Cir. 2005 (citing, 4 Wayne R. LaFave, Search and Seizure § 9.3(a), at 96-97 (3d ed. 1996)); see also, Florida v. Royer, 460 U.S. 491, 497 (1983).

2. In Terry v. Ohio, the Court concluded that a seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." 392 U.S. at 19, n. 16. More recently, the Court held that, for there to be a seizure, the police must apply some physical force to the person being seized or the person must submit to an assertion of police authority. California v. Hodari D., 499 U.S. 621, 626-28 (1991). The Third Circuit has explained that "a seizure occurs whenever an officer restrains the freedom of a person to walk away." Curley v. Klem, 298 F.3d 271, 279 (3d Cir. 2002 citing Tennessee v. Garner, 471 U.S. 1, 7 (1985)). "Although a brief investigatory stop is considered a 'seizure,' not every encounter between the police and a citizen constitutes a seizure within the meaning of the Fourth Amendment." United States v. Williams, 413 F.3d at 352. In light of this authority, the court finds that defendant was seized when asked to exit the Intrepid.

3. The record is undisputed that, when Muniz approached the Intrepid, there was nothing to suggest defendant was engaged in criminal activity. The "911" call does not provide a basis for reasonable suspicion because the caller was neither reporting a crime nor portending criminal activity. Instead, the caller was requesting that police investigate an unfamiliar car parked in the neighborhood. Moreover, the fact that two African

American men were sitting in a parked car in a city neighborhood does not give police a "reasonable, articulable suspicion that criminal activity is afoot." Terry v. Ohio, 392 U.S. at 30. See United States v. Brignoni-Ponce, 422 U.S. 873, 885-886 (1975).

4. Absent reasonable suspicion to initially approach the Intrepid, the issue becomes whether the interaction between Muniz and defendant evolved to create reasonable suspicion to justify the ensuing Terry stop and frisk. Because the testimony of Muniz and Hardison is contradictory, and because the record is otherwise inconclusive, the court finds that plaintiff has not carried its burden of proof in this regard.[16] More specifically, it is the court's view that Muniz's conduct is not consistent with his alleged belief that he was in danger because defendant was armed. Specifically, it is difficult to credit or reconcile why Muniz would direct defendant to place his hands in his lap, in effect causing defendant's hands to be even closer to the

---

[16]The court is cognizant that "[a] judge engaged in adjudicative fact-finding will apply standards of credibility and proof that differ from the cognitive processes of an officer acting in the field." United States v. Bonner, 363 F.3d 213, 219 (3d Cir. 2004)(Smith, J. dissenting). Equally compelling, however, is the court's unique position to assess and evaluate the credibility and demeanor of the testifying witnesses as well as the evidence presented at the suppression hearing. Government of the Virgin Islands v. Gereau, 502 F.2d at 921. "Credibility determinations may be influenced by factors such as a witness' demeanor, his tone of voice and other matters not subject to appellate scrutiny." Id. On that point, the court's first-hand observations of Muniz under oath, including his demeanor, do not establish that his version is more accurate than Hardison's.

alleged "bulge," after Muniz apparently had concluded that the bulge was a weapon. Morever, the only objective piece of evidence - the identification card - cannot be evaluated to assess the alleged discrepancy between defendant's appearance and age noted on the card because the evidence was not presented and, apparently, is no longer available. The radio logs reflect that officers appeared almost simultaneously with Muniz's interrogation of defendant, which would allow virtually no time for Muniz to formulate his observations about the bulge and defendant's demeanor. Despite the presence of at least two other officers at the scene, including one who positioned himself next to the passenger side window and might have seen inside the Intrepid, only Muniz testified at the evidentiary hearing.

5. With regard to plaintiff's suggestion that Hardison's testimony is biased based on his close and longstanding friendship with defendant, there was nothing presented at the hearing to persuade the court to discredit his testimony nor to demonstrate that Hardison allowed this relationship to tarnish his recollection of the events.

6. Considering the totality of this record against the preponderance of the evidence standard, the court finds plaintiff has not demonstrated that defendant's behavior gave rise to reasonable suspicion and, as a result, the stop and frisk violated the Fourth Amendment.

**D. Exclusionary Rule**

1. The exclusionary rule "mandates that evidence derived from constitutional violations may not be used at trial because illegally derived evidence is considered 'fruit of the poisonous tree.'" United States v. Pelullo, 173 F.3d at 136. The government bears the burden of persuasion to demonstrate that evidence seized is untainted by the illegal conduct.[17] United States v. Ienco, 182 F.3d 517, 528 (7th Cir. 1999).

2. The scope of the exclusionary rule is determined by "whether, granting establishment of the primary illegality, the evidence to which objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged by the original taint." Wong Sun, 381 U.S. at 488.

3. The Third Circuit has interpreted Wong Sun to involve two discrete inquiries:

> (1) the proximity of an initial illegal custodial act to the [acquired evidence]; and (2) the intervention of other circumstances subsequent to an illegal arrest which provide a cause so unrelated to that initial illegality that the acquired evidence may not reasonably be said to have been directly derived from, and thereby tainted by, that illegal arrest.

United States v. Burton, 288 F.3d 91, 99 (3d Cir. 2002).

---

[17]Plaintiff has not addressed this issue.

4. Because the gun was discovered almost immediately and without the occurrence of any intervening event, it is derivative of the illegal stop and frisk and it will be suppressed as "fruit of the poisonous tree." Wong Sun at 488.

## V. CONCLUSION

For the reasons stated, defendant's motion to suppress is granted. An appropriate order shall issue.